Mabshamj E. LmiresTorr, J.
This action was tried "before me, without a jury, on September 16 and 17, 1969.
Plaintiff (Brook-Lea) for some time prior to September, 1966, had been considering the installation of a golf course irrigation system at its club in Rochester, New York, and A. J. Miller, Inc. (Miller), experienced in the field of such irrigation systems, solicited an opportunity to be placed on the list of bidders from Mr. Barrow, Brook-Lea’s engineer.
Accordingly, in September, 1966, after making a deposit, Miller and other firms received plans and specifications for the job from Mr. Barrow. The specifications provided that all bids would be opened Tuesday, September 27, 1966 at 7:0G p.m. at the club in Rochester, New York.
Miller attempted to prepare a bid, but on September 26, 1966, a letter was sent to Brook-Lea advising that Miller would not bid because of its inability to secure reliable bids from subcontractors, especially with reference to Item 1 having to do with the water storage reservoir. The letter also advised: “ We are returning the plans and specifications to the engineer.” The plans and specifications were returned that day to Mr. Barrow, and Mr. Barrow subsequently returned Miller’s deposit for the plans.
Prior to September 26 Messrs. Miller and Barrow had talked by telephone on several occasions. Mr. Miller needed a sub-bid for Items 6 and 7 which had to do with electrical equipment, wiring system controls and appurtenances. On behalf of Miller, Mr. Barrow contacted a firm (Bernhardt) in Albany which bid $9,865 for the total electrical in Items 6 and 7. This was confirmed by Bernhardt in a letter to Mr. Miller, dated September 24, 1966. It does not appear when the letter was received, but by this time Miller had decided not to submit a bid because of his inability to get a bid for Item 1.
*898 On September 27, 1966, at 7:00 p.m. four bids, including Item 1, ranging from $159,800 to $209,800 were opened and recorded. No action was taken by plaintiff on these four bids.
On Wednesday, September 28, 1966, Mr. Barrow telephoned Miller and asked him to bid. Barrow stated that Item 1, which called for excavating and building the reservoir for water storage would be waived.
So now, despite the fact that the plans and specifications had been returned to plaintiff’s engineer, Miller decided to submit a bid from the notes made by Mr. Handley, his estimator, and subcontractor bids received, leaving out the storage pond and certain control wire. The bid made on that day was in the amount of $114,743 and was sent by wire to Mr. Barrow at the club. The next day, September 29, a message from Handley confirming the price, and broken down into the items set forth in the specifications, along with a bid bond, was f orwarded to Mr. Lingg, the president of Brook-Lea.
On September 29, 1966, Brook-Lea decided to reject the original four bids, ranging from $134,000 to $170,000, excluding the reservoir, Item 1. No action was taken, however, on Miller’s bid of $114,743, which had been wired to Mr. Barrow at the club on September 28. A letter was sent by Mr. Barrow on September 29,1966 to the original four bidders, as well as to Costabile’s Trenching Service, Inc. and apparently to Oldfield Equipment Co. of Cincinnati. The letter stated that all bids for the turf irrigation system had been rejected and that the committee was asking for rebids to be submitted by noon on October 4, 1966, with a 5% bid bond or certified check. Proposal forms for rebidding were enclosed.
Miller was never notified of Brook-Lea’s decision to rebid the job, and its bid made September 28, at Mr. Barrow’s request, was prepared in a few hours without benefit of the plans and specifications.
Pursuant to the rebid deadline on October 4, 1966, five bids were received ranging from approximately $128,000 to $157,000. The sixth bid considered was Miller’s telegraphed bid of September 28.
On October 5 the board of directors of Brook-Lea held a meeting when 11 new and reconsidered bids ” were discussed. The directors authorized Mr. Fraim (the house committee chairman), after consultation with Barrow, to 11 award a contract for the irrigation work only (items 2 thru 26 of the specs) to the best qualified low bidder ”.
By letter dated October 11, 1966, received October 13, 1966, Mr. Barrow advised Mr. Handley that Miller was the low bidder *899 on the turf irrigation system and asked that he meet Mr. Fraim on October 17 at Brook-Lea Country Club. Attached to this letter was another letter, also dated October 11, 1966, from Mr, Barrow, showing a tabulation of bids received on ‘6 rebid of * * * 4 October, 1966 ” as follows:
“ A.J. Miller, Inc.............................. .$114,743.00
Oldfield Equipment Company................. 127,972.46
Morcar, Inc. ............ 134,331.48
Costabile’s Trenching Service................. 135,663.00
W.C. Sykes, Inc..................... 146,441.05
A1 Turner Excavating........................ 157,185.50 ”
This was the first knowledge Miller had that there had been a rebidding of the job. Mr. Miller was scheduled to be in Texas on October 17, 1966, so he called Mr. Lingg on October 14, and their meeting was postponed to November 3, 1966.
About this time, Mr. Miller (1) realizing his bid was actually made without a careful study of the plans and specifications, or (2) as plaintiff contends, not wanting to “leave money on the table ”, called Barrow and asked that the plans and specifications be returned to him.
The only testimony is that the plans and specifications were returned to Miller prior to October 31, 1966, while Mr. Miller was in Texas. During that time, Mr. Handley rechecked Miller’s bid and found, among other things, that Bernhardt’s bid on Items 6 and 7 did not cover all the electrical work required on the job. Mr. Miller returned October 31, and he and Handley reviewed Miller’s bid.
Mr. Miller testified that Mr. Barrow had previously claimed Bernhardt’s bid covered all electrical work on the job. Handley found that there was considerable underground wiring in Items 19 through 22 which was not included in Bernhardt’s bid. In any case Mr. Miller said Mr. Barrow had made a mistake in advising him that the Bernhardt bid was all inclusive. He explained that the Bernhardt electrical bid was three or four times higher than the usual electrical bid for this type of job, and therefore, he assumed it certainly must cover all of a very sophisticated system. The plans, he said, were the most detailed he had ever seen.
On cross-examination Mr. Barrow testified that he could not recall Mr. Miller’s asking him by phone on September 28, 1966, if the Bernhardt bid covered all the electrical work required on the job. The fact was that Miller’s bid was made largely by memory and notes of what the plans and specifications showed *900 and as the result of several conceded telephone conversations with Mr. Barrow, who had urged Miller to bid.
The balance of this saga shows that on November 3, 1966, Mr. Miller told the president of Brook-Lea he could not sign the contract because of a $7,500 mistake in his bid. A revised bid was submitted by Miller for a total of $124,148.
The board of directors of Brook-Lea thereafter met, considered Mr. Miller’s request for an additional $7,500-, turned down the request and negotiated a contract with Costabile for $120,705.
Brook-Lea’s advertisement for bids required each proposal or bid to be accompanied by a certified check for 5% of the amount of the bid as a guarantee that the contract would be entered into if awarded to a particular bidder. Bid bonds were accepted in lieu of certified checks.
Plaintiff brings this action against the defendant surety whose “bid bond ” was issued to Miller, as principal, for the benefit of plaintiff, as obligee. The bond was for 5% of Miller’s bid and provided in part: “ In the event of the failure of the Principal to enter such contract and give such bond or bonds, if the Principal shall pay to the Obligee the difference not to exceed the penalty hereof between the amount specified in said bid and such larger amount for which the Obligee may in good faith contract with another party to perform the work covered by said bid, then this obligation shall be null and void, otherwise to remain in full force and effect.”
Brook-Lea claims that it is entitled to recover 5% of the contractprice under the bond, as a penalty, because Miller refused to enter into the contract for its original bid of $114,743, and Brook-Lea negotiated a contract with Costabile in the amount of $120,705 for the job, or $5,962 more than Miller’s bid.
Defendant urges that Miller inadvertently made a unilateral mistake in preparing the bid submitted, that such mistake was a material one and of such consequence as to make the enforcement of the contract unconscionable. Defendant further contends that Miller’s mistake in bidding was caused by not having the plans and specifications available; that the bid was hurriedly put together at the behest of Mr. Barrow, plaintiff’s engineer; and that in any event, the mistake was not the result of gross negligence.
Defendant further says plaintiff suffered no actual damage other than the loss of the bargain, because the final contract awarded to Costabile was let for a price which was nearly $7,300 lower than the bid of Oldfield Equipment Co., which was *901 number 2 on the list of bidders when the rebids and the Miller bid were considered on October 4, 1966.
Although this project was a private contract, nevertheless, the manner in which the job was advertised and presented, including a 5% bid security or in the alternative, a bid bond, paralleled the requirements provided by statute in the letting of public contracts.
Both parties agree on the essential elements of a unilateral mistake, viz: (1) the mistake is of such consequence that enforcement would be unconscionable; (2) the mistake must relate to the substance of the consideration, that is, a material feature; (3) the mistake must have occurred regardless of the exercise of ordinary care; and (4) it must be possible to place the other party in status quo. These principles are set forth verbatim in American Law Reports (vol. 52, 2d. Ann. pp. 792, 793) which contains a discussion and. application of all the cases cited by counsel and which sets forth the law applicable to this situation (see, also, Board of Educ. v. Hooper, 350 S. W. 2d 629 [Ky.] and Ann. 70 ALR 2d 1370).
Plaintiff says that Miller waited two weeks from the notification that he was low bidder until he complained about his mistake. The proof is not quite that way. At the time Miller was notified on October 13 that he was the low bidder, he did not have the plans nor did he know the job had been rebid.
Quite understandably plaintiff was happy to have Miller’s original low bid and in effect used it as a yardstick and pattern against which to measure and tailor the rebids. Under the circumstances, when plaintiff knew a rebid was to be had, the plans and specifications should have been returned to Mr. Miller so that he too could have an opportunity to rebid.
In my judgment it would be unconscionable to permit plaintiff to rely on the Miller bid. Miller’s mistake did relate to material features of the job. The misunderstanding as to the Bernhardt bid appeared to be the principal reason. Whether or not Mr. Barrow actually represented that the bid included all the wiring is of no particular consequence. Mr. Miller assumed erroneously that it did, and this led to a material difference, which would have been apparent if Miller had had the plans and specifications. When the plans were returned in October, while Mr. Miller was in Texas, Mr. Handley found the discrepancy without any problem.
It cannot be said that Miller did not use ordinary care in making its bid. It did the best it could with what it had on September 28, 1966.
*902 Finally, plaintiff actually benefited by Miller’s hastily contrived bid. The successful contractor took the job for $120,705, which was nearly $7,300 less than the second lowest bidder on the rebid. Judgment for defendant dismissing the complaint.